IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Alan Shields, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| -*vs*- | ) | No. 17-cv-6689 |
| | ) | |
| City of Chicago, Robert Bandola, | ) | Judge St. Eve |
| Shane Coleman, Michael McAuliffe, | ) | |
| Patrick Josephs, Wayne Wiberg, | ) | Magistrate Judge Martin |
| Jacob Wojtaczka, and Raul Nava, | ) | |
| | ) | |
| | ) | |
| *Defendants.* | ) | |

## AMENDED COMPLAINT

Plaintiff Alan Shields, by counsel and pursuant to leave of Court, ECF No. 24, alleges as follows:

1. This is a civil action arising under Section 202 of the Americans with Disabilities Act, 42 U.S.C. §12132 and 42 U.S.C. §1983. The jurisdiction of this Court is conferred by 28 U.S.C. §12133 and 28 U.S.C. § 1343.

2. Plaintiff Alan Shields is a resident of the state of Illinois.

3. Defendant City of Chicago is an Illinois municipal corporation.

4. At all times relevant, defendants Robert Bandola (Star 7610), Shane Coleman (Star 15359), Michael McAuliffe (Star 17404), Patrick Josephs (Star 1448), Wayne Wiberg (Star 514), Jacob Wojacka (Star 18257), and Raul Nava (Star 4496) were employed by the Chicago Police Department and acted under color of law. Plaintiff sues each in their individual capacity.

5. Plaintiff Shields is a disabled resident of Illinois. He is substantially limited in the ability to move from place to place and, in June of 2016, required ambulatory aids to move because of paraplegia.

6. At approximately 11:00 p.m. on June 6, 2016 plaintiff, who was using crutches to ambulate, was stopped in an alley by defendants McAuliffe and Coleman.

7. Defendant Coleman approached plaintiff and ordered plaintiff to place his hands on the police vehicle.

8. Plaintiff objected to defendant Coleman's order to put down the crutches and told him that without crutches he was at serious risk of falling. Defendant did not acquiesce to plaintiff's request.

9. Defendant Coleman then began to search under plaintiff's armpits which caused plaintiff to lose balance and fall.

10. While on the ground, defendant Coleman cuffed plaintiff's hands behind his back. Defendants Coleman and McAuliffe gave plaintiff several commands to stand up. Plaintiff repeatedly told defendants he was paraplegic and thus unable to stand.

11. Defendants Coleman and McAuliffe then dragged plaintiff near the door of the police vehicle and threw him in the backseat. Plaintiff was transported to the 7th District.

12. Defendants Coleman and McAuliffe had no reason to arrest plaintiff.

13. After arriving at the 7th District, defendants Coleman and McAuliffe ordered plaintiff to ambulate from the police vehicle to the station without any ambulatory aid.

14. Plaintiff repeatedly told Coleman and McAuliffe that he was disabled and could not ambulate without crutches.

15. Defendants Coleman and McAuliffe then summoned the attention of defendant Sergeant Josephs and several other police officers. Collectively these officers started to drag plaintiff into the 7th District. Prior to entering the police station, however, the handcuffs were removed and plaintiff was allowed to use crutches to ambulate.

16. In the processing room defendants Coleman, McAuliffe, Bandola, Sgt. Josephs, Lt. Wiberg, Wojtaczka, and Nava proceeded to use unreasonable force on plaintiff.

17. The individual defendants then cuffed one of plaintiff's hands and proceed to drag him on the floor of the 7th District as depicted below in the City's surveillance video:



-3-

18. At all relevant times, the individual defendants knew plaintiff was unable to walk and requested medical attention caused by the unreasonable force.

19. The individual defendants all participated in dragging plaintiff to cell 09 where he was left on the floor without crutches.

20. After being placed in cell 09, plaintiff made numerous requests to defendants for medical attention. When defendants failed to respond to his requests for medical care, plaintiff started a fire.

21. The individual defendants then dragged plaintiff from cell 09 and resumed using unreasonable force by stomping on his body.

22. Plaintiff was subsequently transferred to Mt. Sinai Hospital where he was treated for difficulty breathing following an assault, documented as having a crushed larynx, and intubated.

23. After plaintiff was transported to a hospital, the individual defendants completed paperwork regarding plaintiff's arrest and processing.

24. Part of this paperwork included a Tactical Response Report (TRR), a document required when a police officer uses force on an arrestee.

25. A day after the TRR's were completed, defendant Wiberg, a Lieutenant at the time, approved the use of force by the officers under his command.

26. The same day Randall Darlin, the Commander of the 7th District, approved defendant Wiberg's use of force on plaintiff. Commander Darlin

determined the use of force on plaintiff was consistent with the Police Department's policies and procedures.

27. Plaintiff also requested the Independent Police Review Authority (IPRA) to investigate the use of force by the individual defendants.

28. IPRA took a statement from plaintiff, obtained all police department records relating to plaintiff's arrest, including surveillance video, and interviewed two members of the Chicago Fire Department. IPRA, however, did not interview any member of the Chicago Police Department regarding plaintiff's allegation of misconduct.

29. IPRA did not recommend to the Chicago Police Department that the individual defendants be disciplined.

## Count I: City of Chicago Violated the ADA

30. At all times relevant, plaintiff was a qualified person with a disability covered by the Americans with Disabilities Act.

31. Defendant City of Chicago denied plaintiff the benefits of the services, programs, or activities of the entity or otherwise subjected plaintiff to discrimination.

32. Plaintiff was deprived the ability to ambulate with his auxiliary aids during his stop and subsequent detention at the 7th District. To move about the 7th District, employees of defendant City of Chicago primarily dragged plaintiff on the ground or carried him.

33. The above described discrimination was solely because of plaintiff's paraplegia.

34. Defendant City of Chicago was deliberately indifferent to plaintiff's rights under the ADA.

### Count II: Unlawful Arrest by Defendants Coleman and McAuliffe

35. During the evening of June 6, 2016, defendants Coleman and McAuliffe arrested plaintiff.

36. Defendants Coleman and McAuliffe did not have any probable cause to arrest plaintiff.

37. Defendants Coleman and McAuliffe violated plaintiff's right to be free from false arrest provided by the Fourth Amendment to the United States Constitution.

### Count III: Unreasonable Force

38. For the reasons previously stated, defendants Coleman, McAuliffe, Bandola, Sgt. Josephs, Lt. Wiberg, Wojtaczka, and Nava used unreasonable force on plaintiff.

39. The unreasonable use of force violated plaintiff's rights secured by the Fourth Amendment to the United States Constitution and caused him to be injured.

## Count IV:  Denial of Medical Attention

40. While at the 7th District, plaintiff pleaded with the individual defendants for medical attention for his serious personal injuries.

41. It was obvious to all individual defendants that plaintiff required medical attention.

42. Prior to being placed in cell 09, defendants denied plaintiff medical attention.

43. Defendants' actions were unreasonable and violated plaintiff's rights under the Fourth Amendment to the Constitution.

## Count V: *Monell* Claim Against City of Chicago

44. At all relevant times, the Chicago Police Department has engaged in a pattern or practice of unreasonable force due, in part, to deficiencies in training, supervision, and accountability.

45. During this period, the City structured its affairs to delegate complete responsibility to IPRA to investigate and recommend discipline to the CPD for a department member accused of excessive force.

46. IPRA was understaffed and limited by a collective bargaining agreement relating to the ability to investigate police officers. For example, a collective bargaining agreement with the Fraternal Order of Police barred IPRA from interviewing an accused police officer until all other investigative steps of the investigative process was complete. This substantially impaired IPRA's ability

to investigate misconduct and resulted in no discipline for officers who used unreasonable force.

47. The Police Accountability Task Force Report found that the "collective bargaining agreements between the police unions and the City have essentially turned the code of silence into official policy."

48. The CPD had no jurisdiction over IPRA and the CPD Superintendent had no power to discipline a police officer for an incident under investigation by IPRA.

49. Garry McCarthy, the former Superintendent of the CPD, believed the disciplinary system was dysfunctional because he had "accountability but no authority." McCarthy conveyed this concern to the Mayor, Corporation Counsel, and Chief of Staff for the Mayor.

50. It was common knowledge among CPD members that the policy to refer citizen complaints of misconduct to IPRA would not result in immediate adverse disciplinary process. CPD members also knew that many IPRA investigations were closed without a request by IPRA to provide a statement.

51. Here, Sgt. Josephs and Lt. Wiberg each had more than five allegations of unreasonable force. As a result of the dysfunctional disciplinary system, neither Josephs nor Wiberg had adverse disciplinary action as a result of these complaints.

52. When plaintiff was detained in the 7th District beginning on June 6, 2016, the individual defendants knew the City had an inadequate policy or practice to hold officers accountable for excessive force.

53. Despite knowing that video was preserved in the 7th District showing unreasonable use of force applied to plaintiff, the individual defendants knew there would be no adverse disciplinary consequences as a result of the policy to defer to IPRA to investigate misconduct.

54. In addition, Sgt. Josephs and Lt. Wiberg knew from past experience that it was highly unlikely that IPRA would recommend discipline against all individual defendants.

55. Consistent with the City's pattern or practice, IPRA did not request any individual defendant to provide a statement relating to plaintiff's allegation of unreasonable force. Accordingly, IPRA closed the investigation.

56. In 2016, Mayor Emmanuel acknowledged the existence of a code of silence within the police department where police officers concealed misconduct.

57. In addition, the United States Justice Department issued a report on January 13, 2017 finding reason to believe the police department has engaged in a pattern or practice of unreasonable force due, in part, to deficiencies in training, supervision, and accountability.

58. The above widespread pattern or practice was deliberately indifferent to plaintiff's rights secured under the United States Constitution and was the moving force behind his injuries.

59. Plaintiff demands trial by jury on his claim for damages.

It is therefore respectfully requested that the Court grant compensatory damages and that punitive damages be awarded against the individual defendants. Finally, plaintiff requests that the Court grant whatsoever other relief may be appropriate, including an award of attorney's fees and costs.

/s/ <u>Patrick W. Morrissey</u>
Thomas G. Morrissey, Ltd.
10150 S. Western Ave., Ste. Rear
Chicago, Illinois 60643
patrickmorrissey1920@gmail.com
(773) 233-7900
*Attorney for Plaintiff*